## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No:

**VALENTINA HENDERSON,**

**Plaintiff,**

    **v.**

**DENVER HEALTH MEDICAL CENTER,**

**Defendant.**

_____

## VERIFIED COMPLAINT UNDER THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e, FOR NATIONAL ORIGIN DISCRIMINATION AND RETALIATION; JURY DEMAND

_____

Plaintiff, Valentina Henderson, by and through her attorneys, Joseph C. Cohen, P.C., and Elwyn F. Schaefer & Associates, P.C., hereby states as follows for her Verified Complaint against Denver Health Medical Center (Denver Health):

I.     **PARTIES**

1. Valentina Henderson is a Caucasian woman born in Ukraine and, at all times relevant herein, has been and continues to be a resident and citizen of the city of Centennial, Arapahoe County, Colorado.

2. Denver Health Medical Center, at all times relevant herein, has been and continues to be a governmental entity owned and operated as a hospital by the Denver Health and Hospital Authority (the "Authority"). The Denver Health campus is located at and around 777 Bannock St., Denver, Colorado 80204.

3. Denver Health is a person and employer as defined in 42 U.S.C. §2000e.

II.     **JURISDICTION AND VENUE**

4.  Jurisdiction is premised upon questions of federal law and civil rights jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, respectively.

5.  The unlawful practices alleged herein occurred at Denver Health's Denver, Colorado, campus.

6.  Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391.

## III.     NATURE OF THE CASE

7.  Ms. Henderson alleges that, commencing in  January 2016, she was subjected to unequal terms and conditions of employment by Denver Health, suffered a hostile work environment due to her national origin, Ukrainian, and in retaliation for engaging in protected activity.

8.  On or about September 30, 2016, Ms. Henderson was discriminatorily discharged based on her protected class and in retaliation for engaging in protected activity.

9.  Denver Health's willful discriminatory behavior inflicted severe emotional distress on Ms. Henderson

10. Title VII, 41 U.S.C. §§2000e(a)(1) and (2), forbids national origin discrimination and retaliation for making claims of national origin discrimination.

11. Ms. Henderson seeks recovery for her economic and hedonic damages, adjusted for tax consequences, arising from Denver Health's discriminatory and retaliatory conduct, and her taxable costs and attorney fees pursuant to Title VII and Colorado common law.

## IV.     ADMINISTRATIVE PROCEDURES

12. Plaintiff has complied with all jurisdictional, administrative, and legal prerequisites to filing this action.

## V.     GENERAL ALLEGATIONS

13. Ms. Henderson incorporates all foregoing and following paragraphs as though fully set forth

herein.

### A. Ms. Henderson's Hiring and Performance, 2005-2013.

14. In 1988 Ms. Henderson earned a Bachelor of Fine Arts degree in Visual and Performing Arts from Kyiv University.

15. Ms. Henderson was a successful film actress in Ukraine when her then-husband decided to move to the U.S. and received permission to do so.

16. Ms. Henderson is literate in English, Ukrainian, Russian, and Polish.

17. After emigrating, Ms. Henderson obtained a Bachelor of Science in Computer Information Systems from Regis University in 2004 and, later, certification as a Java Programmer and in Management Information Systems.

18. All of Ms. Henderson's computer education was presented in English.

19. At all times relevant herein, Denver Health employed more than 500 full-time employees.

20. Denver Health hired Ms. Henderson, then known as Valentina Manko, as a Senior Applications Analyst at the annual salary of $64,459.20 on or about August 15, 2005. **Ex. 1.**

21. At all times relevant herein, Denver Health maintained an Equal Employment Opportunity ("EEO") policy that states, in pertinent part: Denver Health "is committed to providing equal treatment and equal employment opportunities to all applicants and employees with respect to any employee decision." **Ex. 2, p. 3.**

22. Denver Health's EEO Policy demonstrates that it knew throughout the time of the events giving rise to the case at bar that national origin discrimination is prohibited by Title VII. **Id.**

23. Ms. Henderson relatively received promotions and raises from 2005 until she resigned in June 2013 to work as a Senior Healthcare Systems Consultant at Beacon Partners, INC. She became a KPMG advisor performing the same service after KPMG acquired Beacon Partners.

### B. Ms. Henderson's Re-Hire, Performance from June 2014 Through January 2016.

24. Ms. Henderson was rehired at Denver Health on June 1, 2014, as a QA Analyst, Team Lead, a technical, non-managerial position and promotion from her previous job at Denver Health. Her salary was increased to $95,000. **Ex. 3.**

25. Alison Dombek [Caucasian; born in the U.S.A.] became her supervisor upon Ms. Henderson's re-hire. **Id.**

26. Ms. Henderson was given a promotion and raise on October 11, 2014, just five months after her rehire. **Ex. 4.**

27. Dombek was engaged to be married at the time of Ms. Henderson's rehire and seemed to Ms. Henderson to be obsessed with planning her wedding and honeymoon.

28. Dombek spent so much time planning her wedding that she required Ms. Henderson to perform Dombek's managerial duties.

29. Ms. Henderson was concerned about performing Dombek's job because she was neither in a managerial position nor had she received management training from Denver Health.

30. When Dombek was out for her wedding and honeymoon, Ms. Henderson would send emails to Robin Nagy, Dombek's direct supervisor, seeking advice about completing the management tasks assigned to her by Dombek.

31. Nagy never responded.

32. After returning from her wedding and honeymoon, in January 2016, Dombek, then named Dombek-Handle,[1] reviewed Ms. Henderson's performance in 2015 and gave her a satisfactory review and a 2% raise. **Ex. 5.**

---

[1] Dombek-Handle is referred to hereinafter simply as "Dombek."

4

33. Throughout 2014-15, while Dombek was pre-occupied with her wedding and honeymoon, Ms. Henderson regularly worked from home, and her performance continued to be superlative. **Id.**

34. Upon information and belief, as a result of her performance while doing her own work and that of Dombek, Ms. Henderson received a second raise after her rehire to $101,745.00, effective June 1, 2015, one year after being rehired. **Id.**

C. **2016 TERMINATION**.

35. Dombek returned from her wedding and month-long honeymoon in January 2016.

36. Upon her return Dombek forbad Ms. Henderson from working from home without giving any reason for the denial.

37. All of Dombek's other direct reports who had been working from home were permitted to continue to do so.

38. No such Denver Health employee was foreign-born.

39. None of those employees spoke English with a foreign accent.

40. Upon her return from her honeymoon, Dombek began to harp on Ms. Henderson that she couldn't know "how things were done here" because she wasn't born in America and disparaged her communication skills because of her Ukrainian accent.

41. Dombek gave Ms. Henderson negative feedback because Ms. Henderson stood up for herself regarding Dombek's discriminatory and pejorative statements.

42. In early April 2016, Ms. Henderson asked Dombek for permission to work from home again.

43. Dombek again refused the request without explanation.

44. Upon information and belief, prior to, at the time of, and after Ms. Henderson made this request to work from home, other, American-born, native English-speaking workers in her department reporting to Dombek sought and received permission to work from home.

45. Ms. Henderson never was written up nor had any significant job performance issues prior to April 2016.

46. Ms. Henderson, weary and stressed from Dombek's effluvial discrimination, told Dombek in a meeting on or about April 15, 2016, that she wished to transfer to a different department at Denver Health.

47. On April 16, 2016, Dombek met with and verbally "coached" Ms. Henderson for being defensive and insensitive simply because, upon information and belief, Ms. Henderson stood up for herself against Dombek's unfounded allegations of poor performance.

48. Dombek also then told Ms. Henderson she could not seek a transfer within Denver Health because she was not performing her job acceptably.

49. On April 18, 2016, Ms. Henderson sent the first of two emails to Brent Houchin, Denver Health Employee Relations Manager, reporting her concerns about Dombek's discrimination against her. **Ex. 6.**

50. Denver Health did nothing to address Ms. Henderson's complaint even though Houchin assigned Jaime Fleagle, an HR representative, to address Ms. Henderson's complaint of Dombek's discriminatory conduct.

51. Fleagle did nothing to stop Dombek's emotional abuse of Ms. Henderson.

52. Instead, on April 26, 2016, Dombek retaliated against Ms. Henderson for complaining about her discriminatory conduct to Houchin by writing Ms. Henderson up in a "Behavior 1," **Ex. 7**.

53. The Behavior 1 required Ms. Henderson to improve in "building customer confidence, communicating effectively and professionally with others, engaging in open communication, demonstrating sound problem solving, being open-minded and accepting constructive criticism, and coaching and mentoring others." **Id.**

54. In 2015 and April 2016, Ms. Henderson received four awards for her "exceptional performance," and was issued $150.00 checks by Denver Health for two of them. **Ex. 8.**

55. On May 24, 2016, Dombek gave Ms. Henderson a "Not Successful" review. **Ex. 9.**

56. This was the first time Ms. Henderson received a less than satisfactory review during her more than ten years at Denver Health.

57. Despite Dombek's pretextual statements about Ms. Henderson's inability to work with others and communicate well, this review contradicted itself with very positive statements about Ms. Henderson's skills, enthusiasm, and good working relationships from Ms. Henderson's peers and other co-workers. **Id.**

58. Ms. Henderson sent a second email to Houchin on May 25, 2016, stating that nothing had been done to stop Dombek's discriminatory and unfounded harassment. **Ex. 7.**

59. She copied this email to Jeff Pelot, Chief Information Officer for Denver Health' e-Health Services department (eHS). **Id.**

60. Upon information and belief, Houchin assigned Nagy to deal with Ms. Henderson's allegations of discriminatory behavior by Dombek.

61. Nagy did nothing to address Ms. Henderson's concerns.

62. Despite Nagy being told by Houchin to address Ms. Henderson's detailed report of national origin discrimination and retaliation, Denver Health did nothing more to respond to address Ms. Henderson's second email complaining of national origin discrimination.

63. Dombek imposed a PIP on Ms. Henderson on May 26, 2016. **Ex. 10.**

64. Dombek's harassment and hostility toward Ms. Henderson intensified.

65. Dombek stated to Ms. Henderson that she was incapable of building working relationships with her co-workers because of "her culture and that people could not relate to her or

understand her because of her accent," and that she was an ineffective communicator.

66. When Ms. Henderson asked Dombek to provide evidence to support the allegations of poor performance and communication skills, Dombek reprimanded her for being defensive.

67. As a proximate result of the combination of the additional duties foisted upon her and relentless discriminatory harassment by Dombek, Ms. Henderson developed acute stress disorder.

68. Ms. Henderson's emotional distress became so great that her treating physician, Floyd B. Russak, M.D., recommended that Ms. Henderson take FMLA. **Ex. 11.**

69. Ms. Henderson applied for FMLA leave, which was granted. The leave commenced on or about June 7, 2016 and concluded on September 1, 2016. **Ex. 12.**

70. Upon information and belief, Ms. Henderson received part-time disability benefits from Denver Health during her FMLA leave.

71. During Ms. Henderson's FMLA leave Dombek's employment at Denver Health ended. **Id.**

72. Ms. Henderson returned to work refreshed and feeling better, ready to resume her career at Denver Health. She immediately took direct steps to address Denver Health's concerns about her engaging with her team and in-hospital "customers."

73. Denver Health gave Ms. Henderson two weeks before and four weeks after she returned from FMLA to improve her performance under the terms of the PIP.

74. Nagy held a series of weekly meetings, scheduled for 30 minutes each, with Ms. Henderson from September 1 to September 28, 2016, purportedly to give Ms. Henderson feedback on her progress under the PIP. **Id.**

75. Nagy invariably was 10 to 15 minutes late to each meeting and never truly engaged in significant discussions about Ms. Henderson's progress.

76. Nor did Nagy give Ms. Henderson any feedback, negative or positive, during the meetings.

Ms. Henderson had no way of gauging her progress. The uncertainty about her future employment exacerbated her acute stress disorder, which had been alleviated by her leave.

77. In Ms. Henderson's opinion, Nagy simply went through the motions with regard to the weekly meetings to maintain the charade that Ms. Henderson might not be terminated.

78. In 2016, after Ms. Henderson's return from FMLA, Nagy sent out 18 inquiries to various Denver Health employees, only six of whom ever interacted on projects with Ms. Henderson. Id.

79. Those six employees were: Harper, Cameron; Gomez, Cynthia; Dardano, Frank; Chevalier, Patrice; Crawford, Suzanne. **Id.** Of these six employees, Ms. Henderson only ever had two meetings with Ms. Crawford , who, upon information and belief, was Nagy's "right hand man."

80. Upon information and belief, the other dozen recipients were Nagy's direct reports who had never worked with Ms. Henderson.

81. Nagy received negative feedback from only five of the 18 employees to whom she sent her email inquiry, despite having stacked the deck against Ms. Henderson. **Id.**

82. The five employees who gave Nagy negative feedback in response to her inquiry regarding Ms. Henderson were:

- Laura Chambers: reported directly to Dombek, then Nagy after Dombek left Denver Health. Never worked with Md. Henderson;

- Barbara Gold: reported directly to Dombek, then Nagy after Dombek left Denver Health. Never worked with Md. Henderson;

- Ara Prendi-Abrams: Nagy direct report. Only ever attended one meeting with Ms. Henderson;

- Suzanne Crawford: Direct report to Nagy. Never worked with Ms. Henderson but did

attend two meetings with her.

- Bryan Leary: Never worked with Ms. Henderson.

83. Nagy's purported investigation into Ms. Henderson's performance after returning from FMLA was a sham.

84. Denver Health, through Nagy, ignored the reality that Ms. Henderson was unable to improve her work performance while she was out on FMLA for twelve weeks and two days.

85. Nagy's negative feedback during these meetings was subjective. **Id.**

86. Ms. Henderson was terminated effective October 1, 2016 by Nagy in a meeting on September 30, 2016, only one month after her return from the FMLA leave. **Ex. 13.**

87. Denver Health willfully violated its EEO Policy. **Ex. 2.**

88. Her termination further exacerbated Ms. Henderson's acute stress disorder.

89. Due to her emotional injuries, Ms. Henderson was unable to seek employment until mid-2017.

90. Ms. Henderson found a job, started working on December 21, 2017, and now has an annual salary of $95,878 plus an annual bonus of $6,000.

## FIRST CLAIM FOR RELIEF
### (National Origin Discrimination in Violation of Title VII)

91. Ms. Henderson incorporates the foregoing and subsequent paragraphs as though fully set forth herein.

92. Ms. Henderson was born in Ukraine and speaks English with a foreign accent.

93. Ms. Henderson was qualified to perform her position and had performed exceptionally well at Denver Health throughout her tenure, receiving consistently good performance reviews, promotions, performance awards, bonuses, and raises until June 2016.

94. Denver Health willfully discriminated against Ms. Henderson by taking the following adverse employment actions:

- Creating a hostile work environment because of her Ukrainian national origin;

- Failing to take reasonable steps to stop Dombek's discriminatory harassment;

- Permitting continued harassment of Ms. Henderson after the April 18 and May 25, 2016, emails to Houchin and Pelot;

- Failing to prevent further harassment of Ms. Henderson by Dombek after the April 21, 2016, meeting with Houchin;

- Retaliating against Ms. Henderson by placing her on a PIP on or about May 26, 2016, one day after her May 25, 2016, email to Houchin reporting her concerns about discrimination; and,

- Terminating her employment one month to the day after Ms. Henderson's return from FMLA leave on the pretext that she failed to improve under the PIP even though she had been out of work for more than 12 weeks while the PIP was in place.

95. Denver Health's willful hostile treatment of Ms. Henderson was so severe and pervasive that she suffered acute stress disorder.

96. Denver Health's willfully pervasive, unrelenting discriminatory treatment of Ms. Henderson created a work environment that was objectively and subjectively hostile, intimidating, and offensive.

97. Denver Health's adverse employment actions arose in circumstances demonstrating that Denver Health discriminated against Ms. Henderson due to her national origin.

98. Ms. Henderson suffered harms and losses as a proximate result of Denver Health's willful discrimination against her.

**SECOND CLAIM FOR RELIEF**
**(Retaliation in Violation of Title VII)**

99. Ms. Henderson incorporates the foregoing and subsequent paragraphs as though fully set forth

herein.

100.     Ms. Henderson engaged in protected opposition to discrimination;

101.     Ms. Henderson suffered adverse employment actions during and after her protected

opposition that a reasonable employee would have found materially adverse.

102.     A causal connection exists between her protected activity and the materially adverse

employment actions taken against Ms. Henderson by Denver Health.

WHEREFORE, Plaintiff Valentina Henderson prays this Honorable Court to grant judgment in her favor and against Defendant Denver Health Medical Center for national origin discrimination and retaliation, award damages as determined by the trier of fact, including relief from tax consequences, reasonable attorney fees, and costs in her favor and against Defendant Denver Health pursuant to statute in an amount determined by the trier of fact, and grant any further, different or additional relief as the Court deems just and proper in the premises.

## **VERIFICATION**

I am Valentina Henderson, and I hereby declare under penalty of perjury that I have carefully reviewed and fully understood the factual allegations set forth herein and verify that such allegations are true and correct to the best of my knowledge and recollection.

Date: _____                    _____
                                                                          Valentina Henderson

**PLAINTIFF HEREBY DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

RESPECTFULLY SUBMITTED this 2nd day of November 2019.

ELWYN F. SCHAEFER & ASSOC., P.C.          JOSEPH C. COHEN, P.C.
*Attorneys for Plaintiff Valentina Henderson*

  s/ *Elwyn F. Schaefer*                          s/ *Joseph C. Cohen*
    Elwyn F. Schaefer, #2479                    Joseph C. Cohen, #17759
    460 South Marion Parkway, # 1704          800 Rangeview Dr.
    Denver, CO 80209                              Littleton, CO 80120
    (303) 722-3063                                 (303)794-2114
    estoppel14@msn.com                          jcc@jccpc.com

Plaintiff's Address:

7522 S. Trenton Ct.
Centennial, CO  801112